In re JAMES CALVIN BELK
CONSTRUCTION COMPANY,
INC., Debtor.

JAMES CALVIN BELK CONSTRUC-
TION COMPANY et al., Plaintiffs,

v.

S. F. KENNEDY NEW PRODUCTS,
INC., Defendant.

Bankruptcy No. 79–20142.

United States Bankruptcy Court,
N. D. Mississippi.

April 16, 1980.

Fincher G. Bobo and G. Rives Neblett, Neblett & Bobo, Shelby, Miss., for plaintiffs Prather and James Calvin Belk Construction Co., Inc.

Gerald H. Jacks, Levingston, Jacks, Levingston & Land, Cleveland, Miss., for plaintiffs Norquist and McKnight.

Charles M. Merkel, Holcomb, Dunbar, Connell, Merkel, Tollison & Khayat, Oxford, Miss., for plaintiffs J. C. Belk and Barbara Belk.

Douglas C. Wynn and Eugene M. Bogen, Wynn, Bogen & Mitchell, Greenville, Miss., and Robert G. Johnston, Alexander, Johnston & Alexander, Cleveland, Miss., for defendant.

## MEMORANDUM OPINION

EUGENE J. RAPHAEL, Bankruptcy Judge.

The overriding legal question to be decided in this adversary proceeding is the effect to be given to Mississippi Code sections 79-3-155 and 79-3-157, which deal with mortgages of all or substantially all of the assets of a corporation.

### Background

James Calvin Belk Construction Co., Inc., the debtor in this Chapter 11 case (hereafter debtor or the corporation) is in the business of buying the component parts of grain-storage bins and assembling and erecting such bins on farms. Debtor's headquarters was and is at Cleveland, Mississippi. Debtor was chartered in April, 1977, and succeeded and took over a similar business which had been conducted for some years by James Calvin Belk individually. At the outset, Mr. Belk and Carey B. Prather were the sole stockholders, each owning 50% of the stock. At the organizational meeting which was held May 5, 1977 at the Leland office of Taylor Webb, the attorney who handled the incorporation of the debtor, James Calvin Belk, Carey B. Prather, Bryan Prather and Stan Prather were elected to serve as directors until the first annual meeting. James Calvin Belk was elected president and Carey B. Prather was elected vice-president, secretary and treasurer. Following the organizational meeting, Mr. Webb was not called on to do any further legal work for the corporation, although apparently the corporate minute book remained in his possession.

The minutes of a director's meeting held on May 11, 1978 reveal that Carey B. Prather had transferred one share of his stock to James Calvin Belk, giving the latter ownership of 51% of the corporation's stock. These minutes also indicate that Mr. Andrew M. W. Westerfield had succeeded Taylor Webb as attorney for the corporation. Mr. Westerfield testified that the officers of the corporation had been unable to find the original corporate By-Laws and that he had been instructed to draw up a new set of By-Laws, which were introduced at the trial as Defendant's Exhibit "N". These new By-Laws changed the date of the annual meeting to the second Monday of January, beginning with the year 1979 and provided for a board of six directors, whereas the original By-Laws, as well as the Charter (which has not been amended) provided for four directors. Article III of the new By-Laws also contained the following unusual provisions with regard to the functioning of the Board of Directors:

Section 6. *Quorum.* A majority of the voting stock (more than fifty percent (50%) based on the number of shares owned by the director, See Article III, Section 7 below) present at a meeting will constitute a quorum.

Section 7. *Manner of Acting.* The Board of Directors at all times will be made up of stockholders in the corporation. A director's vote on any matter will be determined by the number of shares owned by him and an act of the majority of the stock voted at a meeting shall be the act of the Board of Directors.

Thus, assuming, without deciding, that these provisions are valid, James Calvin Belk, although as president he was subject to control by the Board (Article IV, Section 5) could, as the owner of 51% of the corporate stock, outvote all the other directors combined, and indeed, so long as proper notice of a meeting had been given, could sit in solitary splendor as a quorum of the Board and vote any resolution he might choose, though no one else was present.

The record is not clear when (or whether) these new By-Laws were formally adopted, since no minutes of a meeting of stockholders or directors adopting them was introduced at the trial. However, the 1979 annual meeting of stockholders was held on the second Monday of January in that year and six directors were elected at that meeting, so it must be presumed that these are at least the de facto By-Laws of the corporation, although the defendant's brief "concedes" that the By-Laws drawn by Webb were in effect "at all pertinent times."

Meanwhile, as revealed by the minutes of the 1979 annual meeting as well as by the testimony, Carey Prather had transferred to others a majority of the shares he had owned, so that by the time of the 1979 annual meeting, and from then on, the line-up of shareholders (Plaintiff's Exhibit 7) was as follows:

| | |
|---|---|
| James Calvin Belk | — 51% |
| Carey B. Prather | — 20% |
| Emmett McKnight | — 14% |
| Roy Norquist | — 5% |
| James David Norquist | — 5% |
| Barbara Belk | — 5% |

At the 1979 annual meeting the above six stockholders were elected directors and the following officers were elected:

| | |
|---|---|
| President | — J. C. Belk (hereafter, Belk) |
| Vice-President | — Emmett McKnight |
| Vice-President | — Barbara Belk (hereafter, Mrs. Belk) |
| Secretary | — Carey B. Prather |
| Treasurer | — Carey B. Prather |

### Relations with S. F. Kennedy New Products, Inc.

The minutes of the 1979 annual meeting reflect that, at the time of the annual meeting, the corporation was trying to obtain a loan from the Small Business Administration. Apparently the SBA did not grant debtor's request for a loan. In March 1979 Mr. and Mrs. Belk went to Taylorville, Illinois for a meeting with officials of S. F. Kennedy New Products, Inc. (hereafter New Products or defendant), debtor's largest creditor and principal supplier. Present for defendant were Mr. Sam Kennedy, James E. Richter, Eugene B. Pollock and Ronald J. Kibler. Mr. and Mrs. Belk were the sole representatives of debtor at this meeting. The Belks explained that debtor was in a tight cash position. At that time debtor owed New Products $390,000, could not pay it, could not get financing elsewhere and could not continue to operate unless they could obtain additional essential materials on credit. They told the New Products people that they would have to have at least $150,000.00 in new credit if they were to continue to operate. The upshot of the meeting was an informal, hand-written, but fairly detailed agreement granting debtor an additional $150,000 in credit, with the entire debt, old as well as new, to be secured by liens on all of the debtor's property, a life insurance policy on Belk's life and individual guarantees, and with a covenant by debtor to purchase solely from New Products those items which New Products produced.

The New Products people asked Mr. and Mrs. Belk whether they were "authorized" to enter into this agreement on behalf of debtor. They replied that they were. One of defendant's witnesses quotes Mrs. Belk as saying, "Hell, we *are* the corporation." There is nothing in the record, however, to show any specific inquiry by defendant's representatives as to who were the directors or shareholders of the debtor.

After the March 23 meeting, the Belks returned to Cleveland and later New Products' secretary-treasurer, R. J. Kibler, came to Cleveland for the purpose of entering into a more formal agreement to replace the hand-written one entered into at Taylorville. Mr. Robert Johnston, a member of the Cleveland law firm of Alexander, Johnston and Alexander, represented New Products in the consummation of the new con-

tract and the execution of supporting documents. This contract, which is dated April 13, 1979, names New Products as "Vendors" and the debtor and James C. Belk and Barbara Belk, collectively, as "Vendees." Under this contract:

1. "Vendees" were to execute a promissory note in the principal amount of $587,-665.71 payable on demand.

2. To secure the note "vendees" are to execute a deed of trust to vendor covering the debtor's business real estate at 711 North Chrisman Street, the "undeveloped" · business realty on the north side of Carpenter Street and the residence of Mr. and Mrs. Belk, all in Cleveland, Mississippi.

3. To further secure the note "vendees" agree to grant "vendor" a security interest under the U.C.C. on all other property owned by debtor, including but not limited to inventory, accounts receivable, contracts, fixtures, vehicles, tools, equipment, choses in action, notes, contracts, commercial paper, good will, value as a going concern, and any and all other property owned by the debtor.

4. So long as anything remains owing on the note, "vendees" agree to purchase *exclusively* from "vendor" all galvanized metal body sheets, roofs, floors, fans and heaters, stirring devices, ladders and other accessory and related equipment and supplies for the construction of grain bins, that "vendor" manufactures and that "vendees" can use or need.

5. The parties "agree" that the above provision for exclusive dealing is not in restraint of trade and does not create a monopoly and further agree that in the event of breach of this agreement the "vendor" would have no adequate remedy at law and would be entitled to an injunction.

6. $587,665.71, the amount of the note, is the maximum credit "vendor" will extend to "vendees." Payment for merchandise purchased will be on terms of 2% ten days, net 30.

7. "Vendees" agree to pay "vendor" all sums received by "vendees" not needed in the day to day operation of the business; not to purchase capital items in any one year in excess of $10,000.00 without "vendors" written consent; and not to raise officers' or stockholders' salaries or pay dividends in excess of those currently in effect. "Vendor" will not notify those owing accounts payable to "vendees" of the assignment to "vendor", unless there is a default on the note and "vendor" reasonably deems itself insecure.

8. "Vendees" were to furnish an audit by a C.P.A.

9. "Vendees" will not create or voluntarily permit any additional consensual liens on the property of the debtor or the Belks and agree to notify "vendor" or any "involuntary" liens.

10. "Vendees" will permit "vendor" to inspect "vendees" books and records at all reasonable times and furnish any reasonable business and financial information requested by "vendor."

11. "Vendees" agree to assign to "vendor" a $100,000 policy on James C. Belk's life and a $50,000 policy on Barbara Belk's life and to pay the premium therefor as they become due.

12. The individual "vendees" personally guarantee all obligations of the corporate vendee, now owing to vendor or arising in the future.

13. Vendees agree not to borrow any sums of money from this date on which would exceed at any one time $10,000.00 without the prior written consent of "vendor."

The notes, deeds of trust, security agreement on personal property and U.C.C financing statements in connection therewith were all duly executed. The financing statements were promptly filed in the proper offices and the deeds of trust were duly recorded, thus purportedly giving New Products duly perfected liens on all of the property of the debtor, real and personal, tangible and intangible. Debtor, in accordance with the arrangement continued to obtain materials and supplies from New Products on credit.

The next notable event in this saga took place in June, 1979. Debtor wanted to operate in Arkansas and was blocked from obtaining a license there because of the existence of the large demand note it had executed to New Products in April. So once again the Belks asked New Products for more accommodation and New Products obligingly agreed. By an "addendum" to the previous contract, the demand note was replaced by a slightly larger note, this one for $598,775.01, payable in seven annual installments, the first one of $50,000 a year from date, then five annual installments of $100,000 each and then a final installment of $48,775.01.

The "vendees" executed a new deed of trust to secure the new note, covering the same real property that was in the former deed of trust. It was also agreed that all security agreements signed in connection with the April note were to be deemed to secure the new note without the necessity of actual execution of new instruments, and that all the provisions of the agreement dated April 13, 1979 were to be applicable to the new note; that said agreement of April 13 was to remain in full force and effect and that the addendum agreement was not a novation or new contract but merely an agreement for the renewal and extension of the April note—"except for the matters provided in the next paragraph."

The "next paragraph" gave New Products, in consideration of the "vendor" permitting the "vendees" to make the new note on extended terms, an assignment, lien on and security interest in a third party claim which debtor had made in certain litigation pending in Louisiana against Hunter Manufacturing Company. "Vendees" also authorized their attorneys in that suit to pay any monies recovered by them directly to "vendor", to be applied to payment of the new note.

The addendum agreement bears date June 20, 1979 but it was not actually executed until July, because Mr. Kibler, who was to sign it on behalf of New Products, was unable to come to Mississippi for that purpose until after July 4th.

There can be no question that throughout this period, New Products had been extremely good natured and cooperative in its treatment of debtor. While they did seek to protect themselves by taking liens on debtor's assets, they nevertheless did acquiesce in all of debtor's requests for extensions of time and they did continue to ship merchandise in spite of the fact that the past due account was very large and getting larger. However, in mid-July of 1979, New Products appears to have become disenchanted with the situation. The debtor's payments on the account were still minimal and New Products declined to make any more shipments on credit. Mr. and Mrs. Belk again requested a meeting and once again went to Illinois, this time to Decatur. They told New Products' representatives that they could not continue in business unless New Products continued to ship them merchandise. A new agreement was reached, apparently not reduced to writing, under which New Products would continue to ship and the Belks agreed to notify debtor's customers to make all remittances payable jointly to debtor and New Products. New Products did continue to ship but the debtor did not notify its customers about the change in the form of their remittances.

In August, 1979, New Products sent representatives to debtor's plant. According to defendant's brief, their function was "to assist Belk in the collection of its accounts". Customers were notified to make their checks payable jointly to New Products and debtor. While these checks were deposited thereafter to Belks' bank account, and while debtor was allowed to continue to operate its business, withdrawals from the debtor's bank account could be made only for such purposes and in such amounts as the New Products representative would approve. Much of the money collected from debtor's customers in this period was allowed to be used for payroll and other purposes connected with debtor's business, but effective control of finances and through them of debtor's business, however benign that control may have been, was in

New Products. From then on, debtor could do only such business as New Products permitted it to do.

Even that situation did not last long. On September 12, 1979, New Products, apparently believing that in spite of its supervision, there were still leaks or irregularities in the cash pipeline, declared the note of June 20 in default and, pursuant to the provisions of the April 13 and June 20 contracts, notified all customers to pay only to it, and from then on, New Products itself collected accounts owing to Belk. About this time, J. C. Belk and Barbara Belk left the debtor's employ (or were excluded by New Products). J. C. Belk went to work on a salary basis for a similar business formed at that time by his daughter. Even then, the debtor's business continued under New Products' supervision, using for its operation some of the accounts being collected by New Products', but the business done was limited to the completion of jobs which had already been commenced.

Operations ceased in late October or early November and on November 14, 1979 New Products and two other creditors filed an involuntary petition against debtor for relief under Chapter 7 of Title 11. The following day the debtor filed its voluntary petition under Chapter 11 of Title 11.

The present adversary proceeding was commenced by a complaint filed by the debtor and Carey B. Prather one of its stockholders. At the trial, J. C. Belk, Barbara Belk, the Norquists, Emmet McKnight, Roy Norquist and James David Norquist were permitted to join in the action as plaintiffs. Thus, all of the stockholders of debtor have joined in this action. The complaint alleges the invalidity of the agreements dated April 13 and June 20, 1979 and of the deeds of trust, security agreements and other instruments executed in connection therewith. It seeks to set aside all of the agreements and instruments as invalid for the reason that Sections 79–3–155 and 79–3–157 of the Mississippi Code of 1972 were not complied with. The complaint demands that New Products bring back to debtor's place of business in Cleveland, Mississippi and redeliver to debtor there all of the tangible property it took possession of pursuant to the above mentioned agreements and instruments and that it pay over to debtor all sums collected by New Products from accounts payable debtor's of J. C. Belk Construction Company, Inc. The complaint also seeks preliminary and final injunctions.

A temporary restraining order was entered and was followed by an agreed preliminary restraining order enjoining New Products pendente lite, from disposing of any vehicles or other personal property owned by or acquired from debtor. The order permits New Products to continue collecting accounts receivable owing to debtor but requires that all such collections be deposited in a separate bank account from which withdrawals can be made only on further order of the court.

### Validity of Consensual Liens Held by New Products

Whether the deeds of trust and other security agreements executed in connection with the April 13 and June 20, 1979 agreements can survive plaintiffs' attack depends very largely on the interpretation to be given to Sections 79–3–155 and 79–3–157 of the Mississippi Code of 1972. These Sections read as follows:

§ 79–3–155. Sale or mortgage of assets in regular course of business.

The sale, lease, exchange, mortgage, pledge, or other disposition of all, or substantially all, the property and assets of a corporation, when made in the usual and regular course of the business of the corporation, may be made upon such terms and conditions and for such considerations, which may consist in whole or in part of money or property, real or personal, including shares of any other corporation, domestic or foreign, as shall be authorized by its board of directors; and in such case no authorization or consent of the shareholders shall be required.

§ 79–3–157. Sale or mortgage of assets other than in regular course of business.

A sale, lease, exchange, mortgage, pledge, or other disposition of all, or substantially all, the property and assets, with or without the good will, of a corporation, if not made in the usual and regular course of its business, may be made upon such terms and conditions and for such consideration, which may consist in whole or in part of money or property, real or personal, including shares of any other corporation, domestic or foreign, as may be authorized in the following manner:

(a) The board of directors shall adopt a resolution recommending such sale, lease, exchange, mortgage, pledge, or other disposition and directing the submission thereof to a vote at a meeting of shareholders, which may be either an annual or a special meeting.

(b) Written or printed notice shall be given to each shareholder of record entitled to vote at such meeting within the time and in the manner provided in this chapter for the giving of notice of meetings of shareholders, and, whether the meeting be an annual or a special meeting, shall state that the purpose, or one of the purposes, of such meeting is to consider the proposed sale, lease, exchange, mortgage, pledge, or other disposition.

(c) At such meeting the shareholders may authorize such sale, lease, exchange, mortgage, pledge, or other disposition and may fix, or may authorize the board of directors to fix, any or all of the terms and conditions thereof and the consideration to be received by the corporation therefor. Each outstanding share of the corporation shall be entitled to vote thereon, whether or not entitled to vote thereon by the provisions of the articles of incorporation. Such authorization shall require the affirmative vote of the holders of at least two thirds (⅔) of the outstanding shares of the corporation, unless any class of shares is entitled to vote as a class thereon, in which event such authorization shall require the affirmative vote of the holders of at least two thirds (⅔) of the outstanding shares of each class of shares entitled to vote as a

class thereon and of the total outstanding shares.

(d) After such authorization by a vote of shareholders, the board of directors nevertheless, in its discretion, may abandon such sale, lease, exchange, mortgage, pledge, or other disposition of assets, subject to the rights of third parties under any contracts relating thereto, without further action or approval by shareholders.

 In determining the validity of a mortgage of real or personal property this court must apply local law, in this case the law of Mississippi. *United States v. Jones*, 10 Cir., 229 F.2d 84. However, there does not appear to be any reported Mississippi case in which either of these sections of the Mississippi Code was interpreted or applied. We are thus thrown back on the rule that where state law is silent upon a question and there is a conflict of decisions in other jurisdictions, the federal court construing the law will assume that the state court would follow the weight of authority. *United States v. Jones*, supra, at p. 86.

The defendant argues that under the facts of this case the April and June contract and the documents executed in connection therewith, were made in the usual and regular course of the business of the corporation and that therefore only § 79–3–155 applies and there was no necessity for authorization or consent on the part of shareholders. They have introduced into evidence the minutes of a meeting of the Board which purportedly was held at the office of the company on April 6, 1979. The minutes recite that James Calvin Belk, Carey B. Prather and Barbara Belk, a quorum of the Board were present. They also recite that "all directors had been given written notice personally delivered and had consented to the transaction, if any, of business which may come before this meeting." It then recites that J. C. Belk informed the directors of the indebtedness to New Products in the account of $587,655.71 and of the negotiations with New Products to enter into agreements to secure the payment of said indebtedness and on motion unani-

mously carried J. C. Belk was empowered to enter into contracts and agreements with New Products to insure the payment of the indebtedness to New Products. These minutes were signed only by J. C. Belk. No copy of the "written" notice of the meeting was attached and no waiver of notice.

The testimony of both the Belks and of all the stockholders (who were also directors) was to the effect that no notice of the meeting was given or received. The Belks and Prather, the ones who were supposed to have attended, testified that the meeting had not actually been held. Their testimony was uncontradicted and was not impeached in any way. They are, of course, interested parties. Nevertheless, I believe them. I find that (1) no notice of this meeting was given to the directors and (2) that the meeting did not actually take place. Furthermore, even if it had, there was no quorum present. The By-Laws that the corporation was operating under were the ones drawn by Westerfield and the annual meeting in January, 1979 elected six directors. In my opinion these were de facto the By-Laws of the corporation and the presence of four directors would have been necessary for a quorum, despite Section 6 of Article III of these By-Laws. Mississippi law requires the presence of at least a majority of the board at any meeting. Mississippi Code of 1972 § 79–3–77. There is also in evidence a paper headed "Directors' Ratification Agreement" and dated April 16, 1979 (Plaintiff's Exhibit 2) which states sets forth an authorization, ratification and approval of the contract of April 13, 1979 and the execution by James C. and Barbara Belk on behalf of the corporation of all notes, deeds of trust, assignments, U.C.C. financing statements and security agreements and other documents. This document has five lines for signatures, but it is signed only by J. C. Belk and Barbara W. Belk.

■ Furthermore, consent by the directors was not sufficient. The deeds of trust and security agreement, taken together, mortgaged to New Products all or substantially all of the property of the corpora-

tion and were not in the regular corporation course of business. It was not a purchase money mortgage except as to supplies subsequently delivered. This corporation was not in the business of buying and selling real estate or business equipment. The only cases I have seen which have sustained mortgages of all the property of a corporation, without stockholders' consents, have been cases where the business of the corporation *was* to trade in real estate and the mortgage was given to secure payment of the purchase price of real estate. I hold that compliance with Section 79–3–157 of the Mississippi Code of 1972 was necessary to make these security transactions valid. Concededly there was no meeting of stockholders. That does not end the matter, however.

■ As stated earlier, there are no reported Mississippi cases construing this statute. There are similar statutes in many other states, although there are variations from state to state with respect to the percentage of shares which must ratify the agreement. Cases construing these statutes are gathered together in a comprehensive annotation in 58 A.L.R.2d 785, and see also 19 Am.Jur.2d, Corporations, Sections 1013 and 1014. While there are a few cases to the contrary, the weight of authority seems to be that statutes such as this are for the benefit of stockholders only and that the statute cannot be enforced by the corporation itself, or by its creditors or by its trustee in bankruptcy. I hold, therefore, that as to the plaintiff, James Calvin Belk Construction Company, Inc. (whether it be regarded as the debtor, or as the debtor in possession) the complaint must be dismissed.

■ However, the complaint also named Carey B. Prather as a party plaintiff and he is a stockholder. The remaining stockholders were permitted at the trial to participate as parties plaintiff, and they qualify as persons on whose behalf the statute may be enforced. But the defendant claims that the stockholders were aware of the transactions between debtor and New Products and that their failure to object to the execution of these mortgages and other securi-

ty instruments stands in the way of their being able to recover. The weight of authority in other jurisdictions is certainly clear that the actual holding of a formal meeting of stockholders at which the statutorily prescribed number of shares are voted in favor of a resolution authorizing or ratifying the execution of a mortgage covering all or substantially all of the corporation's assets is not necessarily a prerequisite to the validity of the mortgage. It is enough if they knew that the mortgages were to be executed and either approved or ratified such action by word or conduct, or that they knew of the execution of the mortgages and failed to take any action with respect to such execution under conditions which would create an estoppel. The Belks, of course, had complete knowledge of all the transactions with New Products. They signed the March 23, April 13 and June 20, 1979 agreements and the notes, mortgages, security agreements, etc. both individually and as corporate officers. They signed the purported minutes of a directors' meeting and a ratification agreement. If they were the only plaintiffs the suit would fail. They were not the only stockholders or the only plaintiffs. They owned 56% of the outstanding shares of stock, which was a majority—but not the two thirds required by Mississippi Code of 1972, § 79–3–157. So we must look to the other stockholders to ascertain what their knowledge was.

The testimony was that the directors and stockholders other than the Belks had left the operation of the business completely to Mr. and Mrs. Belk. They permitted them to make all the decisions with reference to the business without consultation or report. One of the directors, Carey Prather, was not employed by the corporation or active in the business and was only infrequently at the place of business. Another was in charge of operations in the field and he also was infrequently at the debtor's headquarters. The other two were employed at the debtor's place of business but held very minor positions. The testimony of all the stockholders, including the Belks, was that they knew nothing of the granting to New Products of liens on all the corporation's assets. Other than Prather, they were aware of the trips that the Belks made to defendant's places of business in Illinois and Prather learned of the trips after they had been made. But none of them was ever informed as to the arrangements which the Belks had made with New Products nor were they aware of the mortgages and other security agreements which had been executed. They did not inquire as to details and they were not told any.

Defendant points out that Prather, McKnight and the Norquists were directors of debtor, as well as stockholders and, as such, were under a duty to know what the Belks were doing. But if these directors were under such a duty, the duty did not run to New Products. Defendant also claims that deeds of trust and financing statements were of record in the Chancery Clerk's office in Cleveland and that such filing and recording constitutes notice. However, I know of no legal requirement that a director make searches of public records at any particular intervals, if at all. Of course, if one of them had seen the public record of debtor's lien transactions with New Products, that would have been notice to him, but the testimony did not show any knowledge of the public records on the part of any of the stockholders. In deed, the testimony was to the effect that they had not seen these records.

The defendant next claims that the testimony of the Belks, Prather, McKnight and the Norquists that only the Belks knew the contents of the March, April and June agreements and of the documents executed to carry them out is simply incredible; that as stockholders and directors they should have been interested in knowing what was going on and that their failing to find out is inconceivable. Such lack of curiosity on the part of the minority stockholders may have been foolish, but I do not find it incredible. The Belks were in complete charge of the business ·and the others were content to leave it that way. Furthermore, the Belks owned 56% of the stock and the others might well not have wanted to get into an internal fight. I had the opportunity to observe these witnesses and to hear their testimony and I believe them. I find that

none of the stockholders, other than J. C. Belk and Barbara Belk, knew about the deeds of trust and other liens, or about the contents of the March, April and June contracts, until September, 1979.

At the meetings in Mr. Johnston's office, Johnston asked Westerfield, debtor's attorney, to get him a "corporate resolution." The resolution that was put in evidence as well as the ratification agreement, were prepared by Johnston. Westerfield got them signed by the Belks but they were not signed by anyone else and they were apparently not delivered to Johnston until September, 1979. There is no testimony whatever that either Mr. Johnston or any representative of New Products ever asked the Belks or Mr. Westerfield how many directors or stockholders there were, or who they were, or how many shares of stock each owned. There seems to have been no communication whatever on this subject, other than the Belks' statement at the March meeting in Taylorville that they had the authority to make the agreement they signed there then. They may well have though they did have. They owned a majority of the shares of stock and there is nothing to show they were aware of the existence of Mississippi Code § 79–3–157.

I have said before, and I say it again, the officials of New Products were at all times, at least up until September, 1979 extremely generous and accommodating in their dealings with the debtor. Nevertheless, § 79–3–157 of the Mississippi Code of 1972 was in existence at the time of these transactions and, on the facts as I have found them, I do not see how the court can find in favor of New Products in this action without making that section completely meaningless. I conclude, therefore, that the minority stockholders, Prather, McKnight and the Norquists are entitled to prevail.

A judgment will be entered declaring void the deeds of trust on debtor's real property in favor of New Products, declaring void the security interest taken by New Products in debtor's inventory, equipment and accounts, including the debtor's third party claim against Hunter Manufacturing Company. New Products will be ordered to return to debtor in possession at debtor's place of business within thirty days whatever equipment it has removed from those premises, to reassign to debtor in possession immediately debtor's claim against Hunter Manufacturing Company and to deliver to debtor within thirty days a list of all accounts receivable of the debtor which New Products has not yet collected and a reassignment to debtor in possession of such accounts. New Products will also be ordered to file within sixty days an accounting showing what sums have been collected by New Products pursuant to the assignment to it of such accounts, to show in said accounting, in detail, how such collections have been disposed of. New Products will be ordered to pay over to the debtor in possession a net sum to be arrived at by subtracting from the total of the accounts collected by New Products the total of all sums properly expended therefrom by New Products for the actual operating expenses of the debtor; but New Products may also withhold from said net sum an amount not exceeding the total of all merchandise sold and delivered by New Products to debtor subsequent to March 24, 1979 and not heretofore paid for.